The case number 313-0558, People of the State of Illinois v. Abdur-Rahi, Appellant by Matthew Mueller. Mr. Mueller. May it please the court, counsel. My name is Matthew Mueller. I represent the defendant, Abdullah Abdur-Rahim. I did not represent him at the motion of Washington's press. I also did not represent him at trial. He was eventually found guilty of unlawful possession of cannabis with intent to deliver as a Class X felony. Mr. Rahim respectfully requests that this court overturn the trial court's ruling denying Mr. Rahim's motion to quash, arrest, and suppress evidence and denying Mr. Rahim's motion to suppress statement. We make that argument based on two principles. The first would be that the duration of this traffic stop was too long and that there was not reasonable suspicion to extend the stop. And the second would be that when Mr. Rahim was removed from his vehicle, he was in custody and should have been read Miranda rights. Briefly, Mr. Rahim was charged on January 17, 2012, with unlawful possession of cannabis. He did file a motion to quash, arrest, and suppress evidence and a motion to suppress statements. That went to hearing. At that hearing, a video was introduced. The video reflects that from the time that Mr. Rahim's vehicle stopped along the side of the road to the time when Mr. Rahim was removed from the car and gave some incriminating statements, that approximately 32 total minutes had passed. During those 32 minutes, it's also obvious from the video, that two officers approached the vehicle a total of five different times. Trooper Morsheiser, a trooper with the Illinois State Police, testified that he may have smelled cannabis upon his first approach to the vehicle, but the record is pretty clear he wasn't certain if he smelled cannabis. Trooper Patterson, with the Illinois State Police, indicated that he believed he might have smelled a cover-up smell, but there's some inconsistency there, too, because he notices it smells like fixed vapor rub. But what became obvious early on in the stop was that my client, Mr. Abdul Abdul Rahim, was on the terrorist watch list. It became obvious because the trooper found that out through dispatch. And the trooper testified that much of the 30 minutes or so that was spent with the defendant alongside the road before he removed him from his car was attempting to figure out what was going on with this terrorist watch list. At the end of the hearing, the trial court ruled against my client, denied the motion to quash arrest and suppress evidence, and denied the motion to suppress statement. Which moves to my first argument, which is that this stop, the duration was too long without reasonable or articulable suspicion. In terms of the duration, I don't think there's any dispute that for a normal traffic stop, 32 minutes is too long. The state doesn't argue it, and it's brief, they didn't argue it at the trial court level. So the next question that we would have would be, was there reasonable suspicion in order to be able to extend the stop? The trial court's ruling was that had this been a situation where Mr. Rahim was just labeled as armed and dangerous, police would have to let him go. But with what the government put out there, with what the government established through this terrorist watch list, the officer was justified in continuing to look into this terrorist watch list situation. The problem with that ruling is that it's contradicted by a United States Supreme Court case by the name of United States v. Hensley. In United States v. Hensley, the Supreme Court was dealing with a situation in which one law enforcement agency was relying on a flyer or bulletin issued by another law enforcement agency. The ruling in that case was twofold. First, the question that the court has to establish is, is the underlying agency, the agency that issued the bulletin, did they have reasonable suspicion or probable cause to issue that actual bulletin? The second element was that the trial court has to take an objective view of that flyer or bulletin and determine whether or not the officer making the arrest or extending the detention based on it has complied with the bounds of that flyer or bulletin. And subsequent cases, People v. Ewing, for example, which I believe is a fourth district case, has extended Hensley or pointed out that Hensley does extend to dispatch communications. And in addition, a first district case, I believe it was, People v. Leighton, indicates that the burden is really on the state to establish whether or not the underlying agency had this reasonable suspicion or probable cause. And that makes sense. Realistically, Mr. Rahim has no ability to be able to establish whether to call someone from the FBI or the NSA or whoever issued this terrorist watch list. So I would suggest to you that a flyer and a bulletin is really a less electronically adept way of doing a terrorist watch list. There's really no difference. It's a law enforcement agency saying, hey, watch out for this. So the question would be, did the trial court have evidence that the underlying agency had a reasonable suspicion in order to be able to issue the bulletin? And in this case, the answer is clearly, there's nothing in the record. We don't know what agency issued it. We don't know why it was issued. We don't know the name of the individual that issued it. We don't know when it was issued. No one from any law enforcement agency that issued this was actually called to testify. So what we're left with is a situation in which we have no idea why he was on the terrorist watch list. We have no idea why it came back through dispatch. I think realistically, and Leighton does talk about this, but the burden has to be on the state because first, they're the ones claiming that they're relying upon this alert. And secondly, it's impractical or impossible for the defendant to be able to effectively challenge this. And that's because the underlying agency, and in this case, it isn't even known who issued it. And under those circumstances, how can you possibly challenge, other than getting up there and saying I'm not a terrorist, how can you possibly challenge whether or not the underlying agency actually had reasonable suspicion? There's just no way to unless you're law enforcement. And that's why it would be the state's burden under these circumstances. The warning came up when he entered his information into Leighton. Is that how it came up? It seemed like the trooper testified he didn't know if it was through dispatch. I think the record reflects that it came up through both. That dispatch first alerted when he buzzed in, but then he was reading things off of his computer. And that's where the second prong of this element comes in. There was no objective reading of the flyer or the bulletin. In fact, the only thing that came into evidence was in a motion to reconsider. And the defendant's attorney asked a number of questions of the officer asking, is this what you read? And the officer said, well, it might have been what I read. And the information that was read, and it's in the record, was that it said terrorist watch list alert, call this 1-866 number, do not extend the duration of the stop, do not hold this person longer than is necessary for the purposes of the stop. So while we don't have a flyer or bulletin, there's certainly some evidence that if the flyer or bulletin was introduced into evidence, it would tell us that the officer shouldn't have done exactly what the officer did. And that makes sense. You don't want some Illinois State police officer screwing up an FBI investigation simply because of the fact that they held the person too long. It's logical. What's remarkable, what's also remarkable at this is that even if you believe that the terrorist watch alert was sufficient grounds in order to be able to extend the duration of the stop, by the time the 30-minute mark comes and Schubert-Morshiser re-approaches the vehicle, that has all been resolved. The 866 number's been called. It's been determined that he's a level 3 risk, which is the lowest risk apparently. And the warning tickets are all written. So even if you believe that the terrorist watch list was a valid basis to be able to extend the stop, by the time he walked up to the car, he should have handed the tickets back to Mr. Rahim and told him to be on his way, unless he had independent reasonable suspicion otherwise. And here the trial court's ruling is very, very important, because there are really two factors that the state heavily relies upon to say that reasonable suspicion was developed during the course of this stop. The first is the alleged smell of marijuana coming from the car. The trial court ruled that that's going to be a pretty tough argument for the state. And the reason it's going to be pretty tough is because it needs to be something a little more than a faint odor. It needs to be something that the officer is very confident with. And the record certainly supports the trial court's ruling, and I believe that this factual ruling would be, is that ruling against the manifest weight of the evidence? And it clearly, clearly is not. The officer was entirely inconsistent about how he described the marijuana. When he first testified in the first hearing, it was a raw odor of cannabis. Then later in that hearing, he said, ah, I don't remember if it was raw or if it was burnt. The video was burnt, and then finally at trial, oh yeah, it was burnt cannabis. The video also reflects it over and over and over again. This officer says, I'm not 100% sure. I don't really know if I smelled it. I'm not sure if I smelled it. That's very, very different than a faint odor of cannabis that you know you smell. And in fact, there's no court case that I was ever able to find that says that an uncertain smell of marijuana is sufficient, reasonable suspicion. All the cases that talk about faint marijuana are situations where the officer knew, I smell marijuana, and that's not this case. And there was also an alleged cover-up smell. Once again, the trial court said, that doesn't really tell me much. And that would be a manifest weight of the evidence standard again if we were to overturn the trial court's ruling. And there, it makes sense. The argument of the trial court matches what was introduced into evidence. And the reason being that, first, there's some differing versions of what it really smelled like. One, it was a masking agent. Then it was a deodorizing agent. Well, then in the video, it's Vicks Vaporub. And if you look at Cooper Patterson's testimony, he indicates, when I first went up to the car, when I immediately got there, I went up to the car, I smelled this smell of this deodorizing agent. That's his testimony. However, on the video, you can actually hear him say, well, when I first went up there, I couldn't smell it. It wasn't until I went up there again and he rolled down his windows that I could actually smell this smell. So we have a real big inconsistency about what was being smelled and when it was smelled. And if it's Vicks Vaporub, well, there's many, many innocent explanations for why someone could smell like Vicks Vaporub, like perhaps they used Vicks Vaporub. So under those circumstances, I would suggest that the trial court's ruling was correct and that if the terrorist watch list was not a valid basis to extend the stop, there was not otherwise reasonable, particular suspicion. That leads into the second element, the second argument that we have, which is that the motion to suppress statements should have been granted. The trial court in this case applied the Mendenhall factors to try to determine if the defendant was in custody. And that's just not the appropriate standards. It's actually the Slater court. And specifically, actually, it's the McCarthy case. I cited it in my brief. It's a United States Supreme Court case that talks a lot about this difficult gray area of when you've pulled someone over and when they're in custody. Because if you remember, the Slater case all asks, the deciding factor is, is this person free to leave? Would this person feel like he could stop the conversation and be free to leave? They're making that determination for custody. And clearly, he couldn't leave under the circumstances in which he's pulled over. The Slater factors are really trying to fit a round peg into a square hole. And McCarthy tries to address that. And in McCarthy, the United States Supreme Court says, well, there's really two factors that are important in deciding whether or not a normal traffic stop is a custodial stop. And they say there are really two factors associated with it that make it not a custody situation. And usually, it's pretty brief. A traffic stop is usually fairly brief. And usually, there aren't very many officers there. And it's in a public place. Thank you. But however, McCarthy also acknowledged that at some point, these traffic stops can become something different than a regular traffic stop. They can become custodial. And what we have here is all of the factors that would normally make this a regular traffic stop are not present. Or at least, they leave as the stop goes on. This is not a short stop. It's 32 minutes. During that 32 minutes, the troopers approach the car five different times, two different troopers. They ask the defendant to get out of the car. They tell the defendant where to stand. They tell him to keep his hands out of his pockets. And they start interrogating him. In addition, there's some question about how many officers were there. If you watch the video, you can see that there are at least three officers there. Prior to Trooper Morsheiser re-approaching the vehicle at about the 30-minute mark, you can hear him having a conversation with the third officer about what they have seen so far. So it's likely, it's a reasonable inference based on the facts, that at the point when Mr. Rahim was removed from his car, there were three officers there and apparently three different squad cars all lined up behind him. Taking that into consideration, it certainly can't be said that this was a normal traffic stop. In fact, it's pretty clear that this was a custodial situation, a situation in which they had decided they were going to investigate drugs, not a traffic stop. And as a result, the trial court should have suppressed the statements and that we're asking that if you rule in our favor in that issue, it should be remanded back to the trial court for a decision on whether or not those statements led to something that was the fruit of the poisonous tree. The court never had to come to that conclusion because it just said he wasn't in custody. If he was granted relief on the first issue, would it matter what would be decided on the second issue? Not a lick. It wouldn't matter. If it was too long at the point where he re-approached the vehicle, then everything after that would have been thrown out anyways. So it makes no difference. The second issue is a throwaway issue if the court decides to rule in Mr. Rahim's favor in regards to the first issue, in my opinion. Thank you very much. Thank you, Mr. Miller and Mr. Nogose. Good afternoon, Your Honors. May it please the court, please counsel. Well, Your Honors, regarding issue one, there's a lot of testimony in this case from Trooper Morsheiser at the first hearing. There's a lot of testimony from him at the second, at the motion to reconsider hearing. There's a video as well, but I think the issue can be decided based on two facts alone. People submit that there was reasonable suspicion that a crime had been or was being committed at the time Morsheiser approached the vehicle the first time. Therefore, that being the separate Fourth Amendment justification, that is the justification for this ongoing detention. Again, two facts, Your Honors. First, Morsheiser, the first time he went up, he said he smelled marijuana. As counsel said, he was not 100% sure. He said it was faint. He said the way the wind was blowing, whatever. That's okay, because what are we talking about here, Your Honors? We're talking about reasonable suspicion. We're not talking about proof. We're not talking about proof needed at trial beyond a reasonable doubt. Heck, we're not even talking about probable cause. We're talking about reasonable suspicion that a crime has been committed. Right when this guy opens up, right when the window goes down, the officer thinks he smells cannabis. I don't see how that isn't reasonable suspicion, Your Honors. And that's fact number one. Fact number two is approximately five minutes later, when Trooper Patterson goes up to the vehicle, he smells what he says, quote, definitely, end quote, was a masking agent. That's what he testified. That's what he says. You can hear it in the video. He's talking about it with Morsheiser when he comes back to the car. So Morsheiser never testified that he smelled a masking agent. He smelled marijuana. Five minutes later, well, there's no marijuana anymore. Why is that? I know why. Officers know why. Because this defendant masked it with whatever he masked it with. It doesn't matter what it was. Patterson said it was definitely a masking agent. Well, if you combine those two facts, marijuana, five minutes later, masking agent, Your Honor, that's reasonable suspicion that a crime had just happened in this vehicle. And once Trooper Patterson came back to the vehicle, came back to the squad, he says to Morsheiser, says, I smelled a masking agent. Approximately 20 seconds later, Trooper Morsheiser calls dispatch and says, send the drug dogs. That was it. He acted right away. Right when he got that second piece of information about the masking agent, he called the dog. I think that was 12 minutes into it. Yes. It was 20 seconds after Patterson got back to the vehicle. Approximately. These are all approximate times. Then he called for the dog. I don't know what else the trooper was supposed to do at that point. He called for the dog. That's right when he put this together, these two facts together. And he was reasonable for doing so. He was reasonable for prolonging the stop for that reason. The trial judge, as counsel noted again, that the trial judge believed that this masking agent wasn't an important factor. And the people strongly disagree with that. The fact that the circumstances in this gentleman's vehicle has certainly changed here in the last approximately five minutes between troopers. The fact that you smell, you're pretty sure you smell drugs one minute, and then the next minute another officer smells a strong odor of a masking agent, clearly things have changed. And that's suspicious. And the combination of those two facts, again, justify prolonging this detention. Defendant makes a couple arguments in his reply brief, or maybe it was his main brief, that during the 20 minutes, 25 minutes the officer was in the car with the terrorist watch list issue, and these officers went back and forth again to the vehicle, that the reasonable suspicion of this odor dissipates every time they go back. The people disagree with that strongly, because he smelled it the first time, and then the masking agent would smell it the second time. The fact is nothing else has changed in this car. Whatever this gentleman did is still in the car. He still did it. Once the officer smells it, that's it. Suspicion is there. And similarly, defendant argues that these other four times that the troopers went back, they didn't smell the cannabis. Well, of course they didn't, because it was masked. It was masked as of the second time an officer went. So of course they weren't going to smell it anymore. Counsel was discussing this terrorist watch list, and the people submit very simply, what was this officer supposed to do when he found this information? Of course he had to investigate it. It would have been grossly negligent if he didn't. But he talked to dispatch. He found out from dispatch that this is the same gentleman that was on the list. They made sure they got the name correct. They found out it was him. And then Trooper Morsheiser kind of found out what he needed to do. There was this 1-800 number. So he said shortly after it was confirmed that this gentleman was on the list, he said to dispatch, can you call this number? And he said it takes time. He said he's done this before. He's had a terrorist watch list issue once before. He said it takes time. So he waited for this whole thing to get flushed out. He finally found at about the 32-minute mark that this was at code 3, which is the lowest level. And then that's it. That was it with the watch list. He did his investigation. He took a reasonable time to do it. He was at the mercy of these folks giving him the information. And once he found out it wasn't an issue, he moved on. At this point, the drug dog has already been called. About 20 minutes ago, the drug dog was presumably on his way. And he went and spoke with him about the drugs, because he didn't do it before because he was busy. He was figuring out what this terrorist watch list issue was all about. And he was totally reasonable in doing so. And he would have been grossly negligent if he didn't do so. There was a gap, at least a couple-minute gap, between getting the code 3 or whatever registered, coming back to the trooper, and the dog ride. Yes. Actually, you're right. I believe there was about a 20-minute gap between that. But I don't see how this is the truth. I guess my question is, how long can he prolong the traffic stop? Does there come a time ever? You have to say, that's just too long. It's just more than is appropriate under the Supreme Court case. Your Honor, there's no set time limit, of course. It's all subjective or objective type of analysis here. But the fact is, the people submit that the testimony and the video together reveals that there wasn't... The officers were never stalling. They were never prolonging this in an unreasonable amount. I think I have the times here, Your Honor. Morsheiser learns that this is a code 3 and the lowest alert at approximately the 31-minute and 19-second marks. Less than 40 seconds later, he says, you can hear it on the video, that he's going to go talk to the defendant about the drugs that were smelled and the masking agent. So that's certainly not unreasonable. And then he goes out and then he gets the defendant out of the car at approximately the 32-52 minute mark. And then they have a discussion outside the car. And at that point, the defendant admits that he was smoking marijuana and that he had a pipe in his car. This was within two minutes of learning about the terrorist watch list. And the people would submit that there was nothing up until this point that was an unreasonable delay. But this is the warning itself, indicative of the extension of the reasonable time. The warning says you can contact this number during the encounter, but if it would extend the scope or duration of the encounter, contact the TSC immediately thereafter. Get enough identifying information during the encounter without otherwise extending the scope or duration of the encounter. Do not detain or arrest this individual unless there is evidence of a violation of federal, state, or local statute. So all of this waiting for this information seems to be in contradiction to what the warning itself says. You're saying he would be derelict if he didn't. But then why is the agency that is presuming putting the terrorist watch list together, and is supposed to be monitoring this, telling him not to do it? Your Honor, I guess I'm going to pose another question. What did they ask him to do? What did they want him to do? What is he supposed to do? He says right here to contact us immediately after the encounter. So he's just supposed to let him go? I don't see how he could let him go because he had reasonable suspicion that he had just committed a drug crime. So regardless of... I thought you said that the reason that they waited was to get this information back within 31 minutes. Well, that is what they did. Nothing happens. They don't come out with any warning. They don't start to question him about drugs or anything until after this 31 minutes, which it seems to me that they didn't need to wait for or that they actually specifically are instructed not to wait, not to detain him. I'm sorry, Your Honor, where were you reading that from? From the motion to reconsider, and this was the language that was contained on the defendant's criminal history that had come up. Your Honor, I think what needs to be considered here is how hard a trooper's job is in this particular situation. This is a man who just pulled over a gentleman in a normal traffic stop. He smells marijuana. He goes back and he finds out that this gentleman's on a terrorist watch list. Is 20 minutes too long to figure out if this gentleman is in danger? He clearly needs to go back up and talk to this person because of the reasonable suspicion of drugs. So he's going to go up no matter what. If he waits 20 minutes or if he goes right up and ignores the terrorist watch list, which again, the people submit is completely unreasonable for an officer to ignore. This police agency, I guess it's ridiculous for them to issue this type of warning. I wouldn't say it's ridiculous, Your Honor. I think it's unreasonable. This is an officer out in the street with this gentleman. What if this gentleman is a code one, which I'm presuming is the most serious? If this is a code three and a not serious, he's going to go back up and give this person his license and this person can be the worst terrorist on earth? What is he supposed to do? Trooper Morsheiser is a human being and he has to worry about his safety. He has to worry about this gentleman who almost certainly has committed a crime. Again, reasonable suspicion of drugs. He's going to have to go back up to this car at some point. I think it's totally reasonable that before he goes up to this car to figure out why this gentleman is on the terrorist watch list, whether or not that comports with the instructions or not. And again, Your Honor, the trooper testified that he was under the impression that he was supposed to call this 800 number or once it turned out that this gentleman was definitively on this list, to call the 1-800 number. That's what he testified and that's what he did. Whether or not that was whatever protocol he was supposed to do, that is not what he testified at the first hearing, what he was supposed to do. He testified he did what he was supposed to do and that's call the 1-800 number. And he did that. Clearly the video shows him doing that. But the paper told him to do something in addition to that and he ignored that. And you keep talking about he smelled marijuana. It seemed pretty clear that he was not sure whether he had smelled marijuana or not. Your Honor, I don't believe he needs to be sure at that point. Again, we're talking about reasonable suspicion, aren't we? We're not talking about proof. We're not even talking about probable cause. We're talking about reasonable suspicion. We're talking about balancing what the police officer knew or thought he knew with the instructions that were on the watch list information that he had. And in terms of his side of the balance, it seems like it was really weak. Your Honor, I wouldn't say it's really weak. Again, this is a human being out in the field with this guy who could be a terrorist. He's a human being who said he wasn't sure that he smelled marijuana. And he said, I'm not relying on this for probable cause. I'm not relying on it. I'm just saying maybe I smelled marijuana. Okay. And then again, Your Honor, the masking agent is pretty significant. Trial Judge Blow didn't think so. I strongly disagree. I don't see how anybody can disagree that that's not a significant development five minutes after he thought he smelled marijuana. But we can agree to disagree, of course. We've done that before. Thank you very much. A question. At the 31-16 point, is the trooper giving him his warning tickets yet? No, Your Honor. That happens, I believe, when he's outside, when Trooper Morsheiser removes him from the car. I think they were completed at that point. I don't remember exactly when he handed them out. 52 minutes, was it? You could be absolutely right. I don't remember. I don't remember that specifically. But at the 52-minute mark was the time that the dog was first seen on the video and reacts positively to drugs being in the vehicle. And Your Honor, one last thing. The defendant said that it was important that the trial judge denied the motion for the reason of the terrorist watch list that the... I just lost my train of thought. The trial judge thought that he denied this motion because of the wait for the terrorist watch list. The people submit that even though he did not talk about the waiting for the drug dog and the reasonable suspicion and the masking agent for what was going on, the people submit that this court, of course, can use those criteria for affirming this. This court can affirm the denial of this motion for any basis. He did more than just not talk about it. He said it didn't rise to the level of either of them, right? He said, didn't the dry-in say that the maybe uncertain smell of marijuana did not rise to the level of reasonable suspicion to detain him? And that he didn't put much weight with the mixed vapor rub, either the masking or deodorizing agent? He made those findings, that that wouldn't be enough. Well, Your Honor, the people would disagree with that. When it comes to findings of fact, we do. But I don't know if that's a finding of fact. I think the facts here are... I think the facts are that there was the suspicion of cannabis smell and that there was definitely, quote, definitely a masking agent. I think those are facts. And I don't think those are in dispute. It's only a masking agent if there's marijuana. If there's drugs. And if there's a question about whether there's drugs, then it seems like there's also a question about whether the vapor rub is a masking agent. I don't believe, correct me if I'm wrong, I don't think the trial judge debated whether or not there was a masking agent. He just said it wasn't significant. I don't think he disputed whether or not it was or was not a masking agent. Correct me if I'm wrong. I don't know if I'm wrong. I don't think I am. I guess that what I'm suggesting is that if the police officer, the officer, first one, was not right that there was a marijuana odor, then what is there to mask? And then does that cast doubt on whether the vapor rub is a masking agent? Yes, Your Honor, I understand where you're coming from, but I don't believe the trial judge definitively said that there was no marijuana smell. I don't think anyone says that. I think everyone's debating how strong the smell is. There's no question that Morsheiser thought he smelled something and that he was pretty sure it was marijuana. I think that's in the record and that's kind of not in dispute. I don't know. It seems to me that it's very much in dispute. That he thought he smelled marijuana? Yeah. I mean, he said he wasn't sure. No, but that's not in dispute. Whether or not it was strong is in dispute. Whether he thought there was a suspicion is not. He testified there was a suspicion of the odor of marijuana. That part is not in dispute, Your Honor. I do have a question. I guess, is he speaking of Dead Horse Bread or certain substances that are known as masking agents? Or is it just any strong smell? You are clearly asking the wrong person, Your Honor. Well, I mean, they use this as if it's some sort of a legal term. I mean, I guess I'm somewhat serious. Your Honor, if I had to guess, I would say a masking agent is anything that can mask an odor. I would think that could be a spray masking agent. It can be a medicinal mask. The word mask, as a general application, can just be to hide something. So it could be Vicks VapoRub. It could be a Glade spray. It could be cologne. It could be absolutely anything. I'm pretty confident in that answer. Your Honor, if there are any other questions, I'd be more than happy to answer them. Other people would request that this Court would affirm the conviction and sentence and affirm the denial of the pretrial motions. Thank you for that. Mr. Mueller, anything to add? May it please the Court? A lot of the discussion that was just had here is largely solved by what the Supreme Court has already issued in its Supreme Court rulings. They've given us the framework for determining when it is appropriate to rely on this alert, when it's appropriate to rely on a flyer. And they've said when the underlying agency has reasonable suspicion and when you can take an objective look at the flyer or the bulletin and know that the police officer didn't go beyond it. So under those circumstances, it doesn't really all that much matter if the officer thought he was doing the right thing if he was doing the wrong thing. Because what we're talking about is a situation in which the questioning is what was in the alert or the bulletin and was there a reasonable suspicion in order to be able to do that. Every question that was asked here today, in my opinion, would be solved if the underlying agency had been called or if the true alert had been brought in. And there's certainly very strong argument that the alert said the opposite of what the officer did. Even that's tough to establish because the actual terrorist alert was never brought in. And that's why Hensley is so important to this case. And why the trial court's ruling that if this was an armed and dangerous situation, it would have gone on too long. But because of what the government's put out there and because of what this says about society, the officer was still able to go further. That just lies in the face of Hensley, unfortunately. However, the state then makes the argument that he has reasonable articulable suspicion otherwise. And a good question was asked, well, is this a manifest weight of the evidence question? Is this a situation in which the factual findings have to be the opposite or unreasonable or arbitrary in order to be overturned pursuant to the manifest weight of the evidence standard? And I would suggest to you very strongly, yes, the manifest weight of the evidence standard does apply to the trial court's question about the smell of marijuana or cannabis. And I refer to it, there's People v. Hanson, it's a 4th District case. And in that case it makes the 4th District at least make very clear that they apply a manifest weight of the evidence standard to whether someone smells marijuana or not. Referring to a 3rd District case, Baldwin makes very clear factual findings and those conclusions or inferences derived from those factual findings have a manifest weight of the evidence standard. And what we're dealing with here very, very clearly is at least inferences that are derived from the testimony, from the finding of fact. And how that's even pointed out even stronger is there were inconsistencies in each one of these officers' testimonies. Very many, a lot of inconsistencies actually about what was actually smelled. It was raw, then it was he couldn't remember, then it was the smell of burnt cannabis. The officer, Patterson, testified that he smelled it as soon as he approached the car and then he testified, oh, I couldn't smell it as soon as I approached the car. These are all factual elements that the trial court considered. And the trial court didn't even, in coming to its conclusion, didn't have to state that he doesn't put much weight in the smell because it's got to be something you're pretty sure of. He didn't have to say, I don't add much weight to that. He did, because those were factual findings he was deriving from the record. This idea that a masking agent is anything that covers the smell, I guess if that's the definition, then anything that smells certainly could be used for articulable suspicion. That really diminishes the state's argument. Cologne or Muslim holy oil or Vicks Vaporub could all be cover-up smells that are thus a basis to create reasonable articulable suspicion. Given everything that we have here, it's clear, even if we don't use the manifest weight of the evidence standard, that we have a situation in which the officer did not have reasonable suspicion. He didn't have just a faint odor. He had an uncertain faint odor. That's a very, very big difference. He was not sure if he had smelled what he smelled. And he states it over and over and over and over again. So if he's not sure, how can he then use it for articulable suspicion? That's why the trial court's ruling that mere suspicion or hunches is not enough. It applies perfectly to this case. As a result, we would suggest that the defendant's motion to quash arrest and suppress evidence should have been granted. We'd also suggest that the defendant's motion to suppress statements should have been granted. So we ask that this court overturn the trial court's rule. Thank you. We'll take this matter under advisement.